NOT FOR PUBLICATION

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| In the matter of | : | Case No. 04-33547/JHW |
| Sheilagh D. Waters | : | |
| Debtor. | : | |
| ———————————— | : | Adversary No. 06-1768 |
| Joseph D. Marchand,<br>the Chapter 7 Trustee | : | |
| Plaintiff | : | |
| v. | : | **OPINION** |
| Sheilagh D. Waters | : | |
| Defendant. | : | |
| ———————————————: | | |

APPEARANCES:   Joseph D. Marchand, Esq.
               117-119 West Broad Street
               P.O. Box 298
               Bridgeton, New Jersey  08302
               Counsel for the Chapter 7 Trustee

               Sheilagh D. Waters
               25 Sycamore Drive
               Medford, New Jersey  08055
               Pro se

**FILED**

JAMES J. WALDRON, CLERK

April 5, 2007

U.S. BANKRUPTCY COURT
CAMDEN, N.J.
BY: Theresa O'Brien, Judicial
Assistant to Chief Judge Wizmur

Before the court for resolution is the Chapter 7 trustee's complaint

seeking to deny the debtor her discharge under 11 U.S.C. § 727(a)(4)(A) and/or

(C).  The trustee contends that the debtor knowingly and fraudulently misled

the court when she sought and obtained permission to sell her home.  He
contends that the debtor failed to disclose to the court the existence of a lease
purchase agreement prepared in connection with the sales contract.  As well,
the trustee contends that the sale of the property defrauded creditors, because
the value of the property beyond the mortgages and the debtor's exemption was
not realized for the benefit of the bankruptcy estate.  According to the trustee,
the debtor entered into an exclusive listing agreement with a real estate broker,
without court knowledge or approval, to sell the house for $300,000, but sold
the house instead for $220,000, with a related lease-purchase agreement
which offered to the debtor the opportunity to lease the house and to buy it
back in two years for a purchase price of $300,000.

        The debtor responds that she did not intend to defraud her creditors.
She contends that she did not disclose the lease-purchase option because the
agreement to allow her to rent the premises, with the buy-back option, was not
entered into until after the sale of her home was consummated.  Therefore, the
agreement could not have been disclosed at the time that court approval was
sought.  As well, the debtor relies on the fact that she is cognitively impaired by
reason of her multiple sclerosis disability, which serves to explain or excuse
her actions.

The record presented here does not support the debtor's defenses.

Rather, the record establishes knowingly fraudulent actions taken by the

debtor in connection with her bankruptcy case to make a false oath or account,

in violation of 11 U.S.C. § 727(A)(4)(A).  In consequence, the debtor may not

receive a discharge in her Chapter 7 case.

## FACTS AND PROCEDURAL HISTORY

The debtor, Sheilagh D. Waters, filed a voluntary petition for relief under

Chapter 13 of the Bankruptcy Code on July 16, 2004.[1]  The debtor scheduled

her principal residence as 146 Wyndmere Road, Marlton, New Jersey, with a

market value of $230,000.00 and three mortgages totaling $198,000.  The

debtor listed $79,500 in unsecured debt.

---

[1]     This is the debtor's fifth filing since 1998.  She filed under Chapter
7 on August 24, 1998, and received a discharge on November 30, 1998 in case
number 98-17887/JHW.  Her case was closed on April 28, 1999.  She filed her
next four petitions under Chapter 13.  Case number 99-16449/JHW was filed
on July 13, 1999 and dismissed on November 20, 2000 for failure to make her
trustee payments.  The debtor refiled that same day in case number 00-
19613/JHW.  This case was dismissed on July 24, 2001 for failure to make
trustee payments and to file all of the required schedules.  The debtor filed a
fourth time on August 1, 2001 in case number 01-17765/JHW.  This case was
also dismissed, on June 25, 2004, for failing to make all of the required trustee
payments.

The debtor's Chapter 13 plan proposed to pay $350 a month for 60

months to pay counsel fees and to cramdown an automobile loan.  The debtor

explained in her plan that the first mortgagee, Litton Loan Servicing, had

received prospective relief from the automatic stay in a prior case,[2] and that the

debtor was now proposing to sell or refinance her property to avoid foreclosure.

On November 3, 2004, the debtor entered into a listing agreement with

real estate broker Mark McKenna to market her home at a listing price of

$289,000.  No court approval was sought or obtained for this retention.  The

listing agreement expired or was terminated by the debtor without achieving

the sale of the house.

Meanwhile, Litton Loan continued with its foreclosure action, and a

sheriff's sale was scheduled for May 19, 2005.  One month prior to the

scheduled sheriff's sale, around April 20, 2005, Rita Henderson, a broker

---

[2]     The following paragraph was included in a court order entered
April 28, 2004, in Case No. 01-17765JHW:

> ORDERED that any future bankruptcy petitions subsequent to
> bankruptcy case number 01-17765 filed by the Debtors, Debtors' spouse
> or relations, or any other person(s) with an interest in the subject real
> property, or occupant(s) or entity of the subject real Property, shall not
> act to impose the automatic stay as against proceedings with respect to
> the subject property unless the debtor's [sic], upon application to this
> Court, and upon notice to secured creditor/servicing agent and its
> attorney, are granted an Order imposing the automatic stay.

employed by Re/Max Connection Realtors of Marlton, New Jersey ("Re/Max"),
responded to the sheriff's sale advertisement of the debtor's home by contacting
Ms. Waters to offer her services to avoid the sheriff's sale. She worked with the
debtor to attempt to obtain refinancing but a refinance could not be obtained.
Thereafter, Ms. Henderson proposed to the debtor that the house be listed for
sale.

The debtor contends that she did not want to sell her house. She
testified that because she and all six children in her charge were disabled and
because the children were all enrolled in special educational programs in the
township, she was dependent on those services and could not move.
Nevertheless, on April 27, 2005, she signed a listing agreement with Ms.
Henderson to market the property at a listing price of $300,000.[3]  No
application was made to the court to retain Ms. Henderson or Re/Max as the
real estate broker to sell the property. Although Ms. Henderson was aware of
the retention requirements for a home owner who has a pending bankruptcy

---

[3]      The listing agreement was signed some time after 11:00 p.m. on or
about April 27, 2005. The debtor claims that she signed the agreement under
duress, after she took her evening medication, with impaired cognitive
functioning at the time. Ms. Henderson testified that the debtor asked her to
come over to deal with the problem of the forthcoming sheriff's sale, that Ms.
Henderson explained every aspect of the listing agreement to the debtor, and
that she saw no indication that the debtor did not comprehend the
arrangement. I need not resolve this dispute to determine the issues directly
implicated here.

case, she testified that Ms. Waters did not mention her bankruptcy until after the listing agreement was signed, and that the debtor had indicated to Ms. Henderson that her bankruptcy "was dismissed," and "wasn't an issue any more."[4]  Ultimately, neither Ms. Henderson nor Re/Max ever showed the property.  The debtor failed to cooperate with any of the brokers who attempted to make contact with her to show the property.  She "would either refuse the appointment or she would confirm it and then once the agent got to her door she would not let them in."[5]

Several days before the scheduled May 19, 2005 sheriff's sale, while Ms. Waters' property was still under the exclusive listing agreement with Ms. Henderson and Re/Max, an unrelated third party, a private real estate investor named Peter Wi, contacted the debtor, explaining to her that he works with investors to arrange for the purchase of properties that are in foreclosure.[6]  He testified that Ms. Waters did not inform him that her house was under an exclusive listing agreement.

---

[4]     T51-15 to 16 (11/30/06).

[5]     Id. at T50-4 to 6.

[6]     Mr. Wi testified in court on September 8, 2005 in connection with a pending motion brought by Ms. Henderson.  The entire transcript of that hearing, including Ms. Waters' testimony, was introduced into evidence at trial as Exh. P-14.

Following the adjournment of the sheriff's sale of the debtor's property to a date in June, which Ms. Waters accomplished through the Superior Court of New Jersey, Chancery Division, without legal assistance, Mr. Wi found investors Chin and Jong Pak to purchase the property, and prepared a contract of sale, which was signed some time between May 19th and May 26th. The sale price was $220,000. He also discussed with Ms. Waters the prospect of an option to repurchase the property, as well as the opportunity to lease back the property on a monthly basis. He understood that she would not sell the property without the opportunity to lease it back for the benefit of her family.[7] Without research, Mr. Wi estimated that the property was worth approximately $250,000 to $260,000, and speculated that the value would appreciate by around $20,000 a year. After two years, he calculated that the house would be worth around $300,000. He prepared a lease back agreement with an option to repurchase the home in two years for $300,000. He recalled that the document was prepared "three or four days before the closing."[8]

On June 1, 2005, through her bankruptcy counsel, the debtor moved on shortened time to sell her home for a sale price of $220,000 to the Paks. She did not advise her counsel about the prospect that she would be able to lease

---

[7]     T34-1 to 3 (9/8/05).

[8]     Id. at T28-1 to 5.

-7-

the house after the sale, or that she would acquire an option to repurchase the

house.  Nor did she mention the exclusive listing agreement she had signed

with Re/Max to sell the house for $300,000.  She signed a certification[9]

describing the transaction as a sale of the property for a purchase price of

$220,000,with the following supplement:

> 4.   The copy of this motion being filed with the bankruptcy court
> contains, as an exhibit, the first two pages of the contract for sale
> (See Exhibit "A").  The copy sent to Isabel C. Balboa, the Chapter
> 13 Trustee, contains the entire contract.  If parties want to review
> the entire contract, they should please contact Jenkins &
> Clayman, attorneys for the debtor, who maintain a copy of the
> contract and will serve it upon all interested parties who request a
> copy of same.

The "entire contract" referred to in the debtor's certificate contained no

reference to any leaseback or option to purchase.  The debtor's motion was

listed for hearing on June 6, 2005, on shortened time, and was granted on that

date.

An order authorizing the sale was entered on June 7, 2005.  The Paks

closed on the sale of the debtor's house on June 8, 2005.  The HUD-1

Settlement Statement notes that $196,678.41 was applied to satisfy the three

---

[9]   The certification submitted on behalf of the debtor erroneously
designated the attorney Stephanie Ritigstein as the debtor at the outset.  The
debtor signed the certification at the end, certifying "that the foregoing
statements are true," and that she was "aware that if any of the statements
made by me are willfully false, I am subject to punishment."  Exh. P-4.

mortgages, $5,156.00 was paid toward settlement charges, and the remaining

$18,167.59 was paid to the debtor on account of her exemption.  Immediately

after the settlement, outside the settlement office, the debtor and the Paks

executed a "Lease with Purchase Option", which provided for a leasing of the

premises for a two-year term for $2,300 per month, commencing on June 15,

2005.  The debtor was given the option to purchase the house for $300,000

through June 15, 2007, with a down payment of $300 (of the $2,300 rental

payment) per month, or a total of $7,200.


On July 22, 2005, Re/Max filed an objection to the confirmation of the

debtor's Chapter 13 plan, seeking payment of a real estate commission on the

sale of the home as an administrative expense.  Re/Max also filed an objection

to the debtor's homestead exemption, contending that the debtor acted in bad

faith by failing to disclose the listing agreement, concealing her bankruptcy

from Re/Max, interfering with Re/Max's ability to show the property, selling it

for less than fair market value and executing a lease purchase agreement.


At the hearing on the Re/Max objections on September 8, 2005, counsel

for the debtor, Eric Clayman, Esq., informed the court that the debtor was

seeking to convert her case to Chapter 7 and that she had agreed to designate

Re/Max's claim as nondischargeable.  The debtor arrived at the hearing later,

and confirmed her desire to convert her case to Chapter 7.[10]  In response to the quest by Re/Max to access the exempted funds received by the debtor at the settlement on her home in June, the debtor testified that she had already spent the $18,000 she received.  She first stated that she used the money to repurchase a home for her mother, located in Maryland, that was in foreclosure.  She was then placed under oath, and amended her testimony to reflect that she "put it [the money] aside for that property," but had not actually made any payments toward her mother's home.  When questioned further, she stated that "[i]t's just gone," and "I don't have it."[11]  She finally explained that she "lived off of it", paid her rent, and she bought four new Dell computers at $3,000 each, two for her house, one for her sister in Florida and one for her nephew in Delaware.[12]  The debtor claimed that she did not know her nephew's address or whereabouts and she declined to give her sister's name and address, stating "I'm not going to give that to you."[13]

On September 13, 2005, debtor's case was converted to Chapter 7.  An order was entered disallowing the debtor's homestead exemption.  The debtor

---

[10]     On December 9, 2005, the request by the law firm of Jenkins & Clayman to be excused as counsel for the debtor was granted.

[11]     T64-3 to 5 (9/8/05).

[12]     Id. at T65.

[13]     Id. at T65-15.

was enjoined from any further use of any proceeds from the sale of the her home, and she was ordered to provide a full written accounting of the $18,167.59 in proceeds that she received.[14]  She was also enjoined from subletting the Wyndmere property or taking any steps that might damage the property's value.  Counsel for Re/Max was authorized to file a lis pendens on the property with the Burlington County Clerk.

On September 16, 2005, Joseph Marchand was appointed as the Chapter 7 trustee.  The trustee filed an adversary proceeding on November 23, 2005 against both the debtor and the Paks seeking to avoid the sale of the debtor's home on the ground that the transfer was fraudulent under New Jersey law.[15]  On April 3, 2006, default was entered against Ms. Waters when she failed to respond to the complaint.[16]

---

[14]    When Joseph Marchand, Esq., the Chapter 7 trustee, subsequently investigated the issue of the use of the funds by the debtor, the debtor apparently produced certain receipts for furniture and other living expenses.

[15]    Adversary case No. 05-6172.

[16]    The matter was resolved as to the Paks by consent order entered on June 7, 2006.  The order provided the trustee with six months to sell the property, with an opportunity to seek to extend that time period.  If the property did not sell, the trustee would abandon the property.  On November 17, 2006, the trustee filed a Notice of Abandonment for the property.  Re/Max's objection was overruled and the property was abandoned by order dated December 29, 2006.

The Paks moved for relief from the automatic stay on December 28, 2005 to evict the debtor from her home after she missed her November and December monthly rent payments.  Relief was granted on January 17, 2006.

On May 1, 2006, the trustee filed this adversary complaint objecting to the debtor's discharge.  The trustee contends that the debtor has violated 11 U.S.C. § 727(a)(4)(A) and/or (C) because she knowingly and fraudulently made a false oath or account by failing to disclose all of the details of the transaction involving the sale of her home to the court and to the parties, including her lease-purchase opportunity and the reduced selling price of the property.  In response, the debtor denies that she intended to defraud anyone.  She claims that the lease purchase agreement did not exist when she sought approval of the sale, and that the impairment of her cognitive functions caused by her medical condition serves to explain and/or excuse any omission on her part in connection with the sale of the house.

## **DISCUSSION**

The trustee's complaint asserts a violation of 11 U.S.C. § 727(a)(4). Section 727 of the Bankruptcy Code, which authorizes the issuance of a discharge to a Chapter 7 debtor, has been described as the "heart of the fresh

-12-

start provisions of the bankruptcy law." H.R.Rep. No. 595, 95th Cong., 1st

Sess. 384 (1977).  To deny a debtor a discharge under one of the section 727

exceptions is considered to be an extreme remedy that should not be taken

lightly.  The section 727 exceptions to discharge must be construed liberally in

favor of the debtor, <u>Rosen v. Bezner</u>, 996 F.2d 1527, 1531 (3d Cir. 1993), and

must be proven by a preponderance of the evidence to support a denial of

discharge.  <u>In re Georges</u>, 138 Fed.Appx. 471, 472 (3d Cir. 2005).


Section 727(a)(4) provides that:

(a)    The court shall grant the debtor a discharge, unless—

. . .

(4)    the debtor knowingly and fraudulently, in or in connection with the case—

(A)    made a false oath or account;

(B)    presented or used a false claim;

(C)    gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

(D)    withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

11 U.S.C. § 727(a)(4).

In order to deny the debtor a discharge under section 727(a)(4), the trustee must "prove two elements:  (1) the debtor knowingly and fraudulently made a false oath; and (2) the false oath related to a material fact." In re Castiglione, No. 05-54849, 2007 WL 319494, *3 (Bankr. D.N.J. Jan. 30, 2007) (citing to Scimeca v. Umanoff, 169 B.R. 536, 542 (D.N.J. 1993)).  See also In re Prupis, No. 04-48414, 2007 WL 295351, *9 (Bankr. D.N.J. Jan. 24, 2007).  The debtor will not be denied a discharge due a mere mistake, inadvertence, an honest error or a mere inaccuracy in his statement.  In re Brown, 108 F.3d 1290, 1294-95 (10th Cir. 1997).

On this record, I conclude that the trustee has established the requisite elements under section 727(a)(4)(A).  In presenting to the court a certification in support of her motion to approve the sale of her home, the debtor made a false oath by failing to disclose the lease-purchase option agreement that she entered into as a part of the transaction involving the sale of her home.  As well, she failed to disclose that the sale price of $220,000 was substantially less than the listing price of the home with a realtor in November 2004 of $289,000, and the listing price of the home with a realtor in April 2005 of

$300,000.[17]

The debtor claims that she did not disclose the prospect that she would be able to rent the property following the sale, and that she would have the option to repurchase the property, because she was not certain that either of these options would be available to her, and that the actual lease with the purchase option was not executed until after the sale.  She testified that she considered her chances to rent the premises to be "a 50/50" proposition, but she decided to take her chances because "[i]t was better than no chances".[18] The debtor's characterization of the lease purchase aspect of the transaction as uncertain at the time the transaction was presented to the court is not sustainable.  Rather, the conclusion is inescapable that Ms. Walters' primary motivation was to retain the home for herself and her family as their residence, and that she agreed with Mr. Wi that the transaction would involve not only the sale of the property, but also the lease-purchase option.  The debtor's testimony, both at the initial hearing on September 8, 2005 and at the trial on November 30, 2006, confirms emphatically the debtor's intentions in this

---

[17]    On this record, I do not determine the fair market value of the home at the time of the sale transaction to the Paks.  Nevertheless, the juxtaposition of the listing agreements with the actual sale price, particularly in light of the side agreement to lease and potentially buy back the property, is notable.

[18]    T18-8 through 11 (11/30/06).

regard.  On September 8, 2005, the debtor testified that when she contracted with Ms. Henderson, she told her "[a]ll I wanted to do, and she knew from the beginning, was anything to (sic) was to save my house.  At the same time I had been looking for investors. . . .  If I wanted to put my house up for sale, I would have went back to Mark McKenna."[19]  In response to questioning about her intention to contract with Ms. Henderson, Ms. Waters responded that her "intention was for Ms. Henderson to help me save my home."[20]  It is noted that from April 27, 2005 through early June, Ms. Walters did not permit Ms. Henderson or any related realtor to show the house for the listed price of $300,000.  Nevertheless, Ms. Walters signed a contract for the sale of the house for $220,000 in May, just a few days after she met Mr. Wi.  The only explanation is that in conjunction with the agreement to sell, she was offered the chance to rent and buy back the property.

At the trial of this matter, on November 30, 2006, Ms. Waters confirmed that when Mr. Wi came to the house, she identified himself as "an investor" who "knew the house was in foreclosure," and "that he helped families to be able to to be able to (sic) stay in their homes."[21]  Ms. Waters confirmed that at

---

[19]     T52-16 through 23 (9/8/05).

[20]     Id. at T54-25 to T55-1.

[21]     T14-12 through 14 (11/30/06).

the time she signed the agreement of sale, Mr. Wi "said that I would be able to

rent it back."[22]  In response to a question about whether she would have

considered selling the house to Mr. Wi for $220,000 without a lease back or an

option to purchase, she responded "No, I would have let it go for foreclosure."[23]

She acknowledged that the opportunity to rent the premises was a critical

point for her.  "The whole purpose of me to be able to rent it back was to keep

me and my family stable because of the fact that I am disabled and so are my

kids.  To be able to buy it back was not -- that wasn't a major deal."[24]  She

acknowledged that she had seen the lease purchase agreement before the

settlement at her home, but could not say exactly when.[25]  According to Ms.

Waters, the agreement was not filled out when she first saw it, although she

discussed the monthly rental with Mr. Wi.[26]


Ms. Waters further confirmed her unwillingness to sell the house without

a lease-back when she recalled conversations with Ms. Henderson about a

"worst case scenario" of the sale of the house.  Ms. Waters testified that she

---

[22]   T14-24 through 25 (11/30/06).

[23]   Id. at T17-17 to 18.

[24]   Id. at T17-20 through 24.

[25]   Id. at T38-14 through 21.

[26]   Id. at T39-21 through 24.

told Ms. Henderson that "I would let the house go in foreclosure before I would

sell my house straight out,"[27] and that "I didn't want to straight out sell the

house."[28]  In response to my questioning of the debtor regarding a meeting

between the debtor and Ms. Henderson shortly before the settlement on the

sale of the house to the Paks, the debtor testified as follows:

> THE COURT:  And you told her [Ms. Henderson] I don't want to sell
> the house?
>
> MS. WATERS:  Yes.  This is -- and I talked to her and I told her and I
> said, you know, this is not what we were supposed to be doing.
>
> THE COURT:  Did you tell her that you had an arrangement with Mr.
> Wi?
>
> MS. WATERS:  I told her, I said we were supposed to be looking for
> an investor, you know, I found an investor.  We were -- this is what
> you and I were supposed to be -- this is what we were supposed to
> be doing.  She didn't want to hear anything about that.
>
> THE COURT:  Did you tell her that you had the chance to lease the
> property back?
>
> MS. WATERS:  Yes.  She knew that's what we were supposed to be
> doing.  That was the whole purpose of everything I was supposed
> to be doing.[29]

The testimony of Peter Wi corroborates the conclusion that at the time

---

[27]     T60-23 through 25 (11/30/06).

[28]     <u>Id</u>. at T62-12.

[29]     <u>Id</u>. at T63-5 through 21.

the debtor agreed to sell the house to the Paks, she had also entered into an

oral agreement to lease the property back.  Mr. Wi testified at the September 8,

2005 hearing that at the time Ms. Waters signed the contract of sale, the

parties agreed that Ms. Waters would continue to occupy the property as a

tenant.  Mr. Wi opined that Ms. Waters would not have sold the property to the

Paks if he had not agreed to lease the property back to her, with an option to

buy it back.[30]

        During the trial, the debtor clearly and forcefully expressed her

determination to stay in the house with her family.  Her suggestion that she

did not disclose the lease-purchase agreement to the court when she sought

approval of the sale of the home because the agreement was not entered into

until after the settlement is not credible.  It is understood that the actual lease-

purchase option was not signed until after the settlement.  Nevertheless, the

sale and the lease purchase option were part of a single transaction which was

agreed upon between the parties before the debtor submitted the arrangement

to the court for approval.  The certification presented to the court, which

represented that the contract of sale constituted the entire understanding

between the parties, constituted a false oath.

---

[30]    T33-25 through T34-3 (9/8/05).

I conclude further that the false oath related to a material fact.  "The subject matter of a false oath is material and warrants a denial of discharge if it is related to . . . the existence or disposition of the debtor's property."  6 Lawrence P. King, Collier on Bankruptcy, ¶ 727.04[1][b] at 727-41 (15th Rev. Ed. 2006).  See also In re Chalik, 748 F.2d 616 (11th Cir. 1984); In re Wills, 243 B.R. 58, 62-63 (9th Cir. BAP 1999).  Here, the debtor's property, which may have had some equity available for the benefit of creditors, was transferred with a retention by the debtor of the benefit that was not disclosed to the court and to parties in interest.

The critical question remaining is whether the debtor made a false oath with the requisite fraudulent intent.  As explained by the court in Castiglione, in order to warrant a denial of discharge the court must determine that the debtor possessed the requisite fraudulent intent.  While the debtor's actual intent is most often difficult to glean, it has been held that the "requisite degree of fraudulent intent is shown if the debtor 'engaged in behavior which displayed a reckless and cavalier disregard for the truth.'"  In re Zimmerman, 320 B.R. 800, 810-11 (Bankr. M.D.Pa. 2005) (quoting In re Dolata, 306 B.R. 97, 106 (Bankr. W.D.Pa. 2004)).  See also In re Oscarson, No. 05 B 52582, 2007 WL 744616, *13 (Bankr. N.D.Ill. Mar. 6, 2007); In re Anderson, 350 B.R. 803, 808 (Bankr. S.D.Ill. 2006); In re Kurtaj, 284 B.R. 528, 530 (Bankr.

D.Conn. 2002).  "A reckless disregard of both the serious nature of the

information sought and the necessary attention to detail and accuracy in

answering may rise to the level of fraudulent intent necessary to bar a

discharge."  In re Mazzola, 4 B.R. 179, 182 (Bankr. D.Mass. 1980).  "[E]xtreme

carelessness of the debtor in filling out the Petition will not excuse a false

oath."  Scimeca, 169 B.R. at 543.  The Zimmerman court also noted that

"'[s]worn statements filed in any court must be regarded as serious business.

In bankruptcy administration, the system will collapse if debtors are not

forthcoming.'"  Id. at 811 (quoting In re Jackson, No. 03-10717, 2004 WL

2595900, *9 (Bankr. D.N.H. Apr. 26, 2004)).  See also In re Prupis, 2007 WL

295351 at *9-10.


     The presentation of a sworn statement in connection with an application

to approve the sale of a debtor's property is "serious business".  Here, the

debtor recklessly and cavalierly disregarded her obligation to disclose all

aspects of the proposed agreement.  She recklessly disregarded her obligation

to accurately present all aspects of the transaction.  The fact that she was

moved to proceed in the way that she did to protect the home for the benefit of

herself and her family does not excuse her misdeed in presenting a false oath

to the court.  Such a misdeed cannot be countenanced.  The debtor's intent to

knowingly and fraudulently make a false oath is established on this record.

The debtor attempts to explain and/or excuse her actions by reference to her medical condition.  At the outset of the testimony offered by the debtor on November 30, 2006, Ms. Waters presented a letter from Dr. Karen M. Scardigli, D.O. of Neurology Consultants, P.A., dated May 10, 2002.  The letter states as follows:

> Presently being treated for possible MS since 6/30/01.  She is Experienc[ing] Severe headaches, migraines, depression, decreased cognitive functioning and trouble walking.  She is unable to sit or stand for any long periods of time.  Her condition is not expected to get better and may become worse.[31]

During the November hearing, Ms. Waters stated that she wasn't feeling well, and that her Multiple Sclerosis ("MS") was "acting up".[32]  She testified that she developed MS symptoms approximately 20 years ago, and that the disease progressed more aggressively about six years ago.  She explained that she now sees her family doctor and a neurologist every three months, that she has an MRI taken once a year, and that she takes daily shots to keep her disease from progressing.  Her symptoms include balance issues, peripheral vision problems, numbness in her legs, muscle spasms, and processing and reading comprehension issues.

---

[31]     T7-15 to 22 (11/30/06).

[32]     Id. at T6-23 to 7-3.

The debtor is 42 years old, has a Bachelor of Arts college degree in education and taught kindergarten for four years.  She later worked as a parole officer in the juvenile justice system for four years.  At the present time, her income is comprised of social security disability for herself and for her children, as well as adoption and foster care subsidies.

On this record, I will accept the debtor's testimony that she suffers from MS, and that she routinely experiences symptoms of her disease that impair her daily functioning.[33]  However, at both the September 8, 2005 and November 30, 2006 hearings, Ms. Waters presented herself as a very articulate, intelligent and competent person who ably represented herself in these proceedings.[34]  At the time of the transaction at issue, the debtor had access to legal advice.  She testified that about a week after she signed the listing agreement with Re/Max on or about April 27, 2005, allegedly under duress, she consulted another law firm about whether the agreement was binding, and was advised that the agreement was binding.  She offered no explanation other than "cognitive impairment" for her failure to advise her bankruptcy attorneys about the entire

---

[33]   I note in passing that the letter from Dr. Scardigli, which was written over five years ago, is hearsay, but was not objected to when it was presented in court.

[34]   I note in this regard that in May 2005, the debtor, on her own, succeeded in applying for and receiving an adjournment of the sheriff's sale of her property.

transaction involving the sale of her home, including the leaseback and purchase option, when she sought court approval for the sale.  I cannot sustain her defense that her actions and/or omissions are explained or excused by the cognitive impairment she experiences as a part of her medical condition.

I conclude that the debtor knowingly and fraudulently failed to advise her attorney and the court about the nature of the transaction involving the sale of her home, intending by the sale to maximize the benefit of the sale to herself and her family and to defraud her unsecured creditors of any potential benefit.  The elements of § 727(a)(4) have been established.  The debtor's Chapter 7 discharge is denied.

The plaintiff is requested to submit a form of order.

Dated:   April 5, 2007

_____
JUDITH H. WIZMUR
CHIEF JUDGE
U.S. BANKRUPTCY COURT

-24-